## B. Horwich v. Western Brewery Co.

1. SALES—*Where the Rule Caveat Emptor Applies.*—In sales of personal property, where the purchaser inspects the goods he buys for himself, even though the vendor may know the purpose for which the purchaser intends them, the rule of *caveat emptor* applies, in the absence of fraud or an express warranty.

2. SAME—*Where an Implied Warranty of Fitness Does Not Arise.*—An implied warranty of fitness does not arise (in the absence of fraud) where the purchaser selects the goods on his own judgment, although the vendor (not a manufacturer) knows that they are intended for a particular use. If the purchaser gets the exact article he buys and buys the very thing he gets, he takes the risk of its fitness for the intended use.

3. SAME—*Where an Express Warranty Does Not Arise.*—A sale of export beer bottles is a very different thing from a sale of bottles to be used for bottling export beer, particularly when the judgment of the purchaser is equal to that of the vendor. The expression '' export beer bottles '' is to be construed as a mere description of the kind of articles for sale by the vendor.

4. ACCORD AND SATISFACTION—*Acceptance of a Part, When Not, as to an Entire Amount Due.*—Where a person is indebted to another, the amount of which is in dispute, and he writes such person to draw a draft up )n him for a sum less than the amount claimed to be due, which is done, but he does not state in his letter that the payment of the draft shall extinguish the entire indebtedness, it will not be necessary for the creditor to say that he accepts in full of all his demands, and the amount received can not be successfully pleaded as an accord and satisfaction to the entire indebtedness, in a suit by the creditor for its collection.

**Assumpsit,** for goods sold, etc. Error to the City Court of East St. Louis; the Hon. SILAS COOK, Judge, presiding. Heard in this court at the August term, 1900. Reversed and remanded. Opinion filed March 11, 1901.

**Statement.**—Plaintiff in error resides in Chicago and is a dealer in glassware, including beer bottles; defendant in error is in the business of brewing and selling beer at Belleville in this State. The matter in controversy grows out of correspondence by letters and by telegrams between the parties, as follows:

"BELLEVILLE, ILL., June 24, 1898.
B. HORWICH, Chicago, Ill.

DEAR SIR: Quote us price on two car loads of bottles, one to be loop and the other crown bottles, to be either

Horwich v. Western Brewery Co.

green or amber, new or second-hand.   Price to be f. o. b. here.   How soon can you deliver?

Very respectfully,
WESTERN BREWERY COMPANY."

"CHICAGO, June 25, 1898.
WESTERN BREWERY COMPANY, Belleville, Ill.

DEAR SIRS: Your favor of the 24th inst. received.   In reply, I beg to offer you pints seal finish amber export beer bottles for $3 per gross, and qts. of same style for $4.10 per gross f. o. b. Belleville.   The bottles are, except a few, second-handed, but pretty clean and can easily be washed.   I can start loading within a day or two after I get your order.

Yours very truly,
B. HORWICH."

"BELLEVILLE, ILL., June 27, 1898.
To B. HORWICH, 347 So. Halsted St.

Can use car pints, two seventy-five delivered.   Will you accept.

WESTERN BREWERY COMPANY."

"BELLEVILLE, ILL., June 27, 1898.
To B. HORWICH, 347 So. Halsted St.

Will take car two eighty-five delivered our count for such as can be used to govern settlement.   Wire and ship.

WESTERN BREWERY COMPANY."

"BELLEVILLE, ILL., 6–27, 1898.
To B. HORWICH,

Ship via Air Line East St. Louis.

WESTERN BREWERY COMPANY."

"CHICAGO, 6–27, 1898.
To WESTERN BREWERY COMPANY.

Will ship car pts. seal finish expt. beer bottles second-hand.

B. HORWICH."

"CHICAGO, June 27, 1898.
WESTERN BREWERY COMPANY, Belleville, Ill.

DEAR SIRS:   I have received your telegram ordering car of pint seal export beer bottles at $2.85 per gross f. o. b. your city, which I have accepted, and now confirm it.   You mention in your message 'our count for such as can be used' and wish therefor to repeat again that the bottles are *not crown* but seal finish for the little rubber stopper, amber color, second-hand; they are called pints by all bottlers and brewers but hold only, actual measure, 12 ounces, and while they are second-hand they are in such condition that they can be cleaned, as they were used for beer only,

as the labels on them will signify.    I shall start loading in a day or two and order to be shipped, via the Air Line as per your instruction.    In the meantime please send me a written order and much oblige,

Yours very truly,

B. HORWICH."

" BELLEVILLE, ILL., June 30, 1898.

B. HORWICH, Chicago, Ill.

DEAR SIR:    We beg herewith to confirm our order for car load of bottles ordered as per our telegram of the 27th inst.    · ·

Very respectfully,

WESTERN BREWERY COMPANY.

WM. BENDER, JR.,
      V. Pres. and Gen'l Mgr."

" BELLEVILLE, ILL., July 9, '98. ·

B. HORWICH, 238 Forquer street, Chicago.

Car arrived; can not use turpentine and other like bottles for beer; will unload to pay for what we can use, otherwise car here subject to your orders; answer.

WESTERN BREWERY COMPANY, 8:11 P. M."

"CHICAGO, July 10, 1898.

WESTERN BREWERY COMPANY, Belleville, Ill.

DEAR SIRS:    Your telegram from yesterday was delivered to me this morning.    In reply will say that you may receive and unload the car and if you find any turpentine and other like bottles please set them aside for me.    I am positive that you will not find enough such bottles to amount to anything.

Yours very truly,

B. HORWICH.

P. S.    There may be some bottles that look dirty and unclean on the outside, but you will find by washing them a little  that  they are all right and used by many bottlers here."

" BELLEVILLE, ILL., August 12, 1898.

B. HORWICH, Chicago, Ill.

DEAR SIR:    We are testing the bottles and making up account.    As soon as I return from a trip I am going to make, I will remit you.

Very respectfully,

WESTERN BREWERY COMPANY.

WM. BENDER, JR.,
      .V. Pres. and Gen'l Mgr."

"Belleville, Ill., August 16, 1898.

B. Horwich, Chicago, Ill.

Dear Sir: Replying to your favor beg to state our Mr. Bender is at present out of the city. As soon as he returns from the East we will refer your letter to him.

Very respectfully,
Western Brewery Company."

"Belleville, Ill., Sept. 8, 1898.

Mr. B. Horwich, Chicago, Ill.

Dear Sir: Replying to your favor of the 6th inst., beg to state our Mr. Bender is at present out of the city. We expect him to return the latter part of the week, and will then refer your letter to him. He has the matter in charge, and we can therefore do nothing until his return.

Very respectfully,
Western Brewery."

"Belleville, Sept. 21st, 1898.

Mr. B. Horwich, Chicago, Ill.

Dear Sir: I have personally superintended the checking over of the car of bottles we received from you at the time they arrived. We threw out all that was broken, all that were nicked in the head and nicked in the neck where the stoppers go in. We took from the car 450 trays holding 96 bottles each, and 35 extra bottles, making a total of 43,235 bottles. I then placed 3 lots of 1,200 each into the steaming vats and found that we had to throw away 164, 181, 124, respectively, out of the lot, or 469 bottles that were defective out of the 3,600. I then went away on a trip, and since getting back last week put in three lots of 1,200 each and our loss was 172, 149 and 216 respectively. The average on the first batch in the steaming vat was 157 and in the second lot 179 bottles out of every 1,200 placed in the steaming vat, making an average of the two lots of 168 bottles lost for each 1,200. We found that a good many of the necks where the rubber corks went it would hold the beer until we steamed it and then the defects in the neck would show the leakage or breakage. The average loss of 168 bottles in the six batches put in the vat of 1,200 bottles each, or 14 per cent, which I have deducted from the total amount taken out of car, 43,235, or 6,053 bottles, leaving a balance actually received, 37,182, if our per cent remains as it did in these six batches. The 37,182 bottles will make 258 gross and 30 bottles. We ask you to make a draft for

258 gross, 2½ dozen at $2.85, less freight bill enclosed, $112.20.

Very respectfully,

WESTERN BREWERY COMPANY.

WILLIAM BENDER, JR.,
        Mgr. Sales Dept."

"CHICAGO, Sept. 29th, 1898.

WESTERN BREWERY COMPANY, Belleville, Ill.

DEAR SIRS: I intend to send a man over to your brewery to receive all bottles not paid for. Please advise me by return of mail, if it will be convenient for you, if my man comes there by Tuesday, the 4th of next month.

Yours very truly,

B. HORWICH."

"BELLEVILLE, ILL., Sept. 30, 1898.

B. HORWICH & Co., Chicago, Ill.

DEAR SIR: We have your kind favor of the 29th, and in reply beg to say we did the same with your bottles, as we do with Busch's North Baltimore Bottle Glass Company, and Obear & Nestor's, by throwing those we can not use into the waste glass pile. We have a few samples in the office, which we can show you to convince you of the fact. We did not understand that you wished us to keep the nicked and broken bottles for you. We are very sorry we did not know it, for we would surely have put them aside for you.

Very respectfully,

WESTERN BREWERY COMPANY.

W. BENDER, JR.,
        Vice-Pres. & Gen. Mgr."

There is some further correspondence, but it is of a controversional character and in no way tends to throw light on the matters at issue.

Pursuant to the foregoing correspondence, Horwich, on the 6th of July, 1898, shipped to the Brewing Company 60,200 bottles. The manner in which the company dealt with the bottles after their arrival in Belleville is stated in its letter of September 21, 1898; in addition thereto Mr. Bender, the general manager of the company, testified that 17,000 bottles were thrown away when the car was unloaded; that some were broken and others nicked in the neck. He also says:

Horwich v. Western Brewery Co.

"I counted the bottles I could use.    I did not wait for an answer from Mr. Horwich.    I unloaded the car; threw out the bad bottles and took the good ones."

In this manner there were selected out by Mr. Bender 43,235 bottles; 3,600 bottles were then filled with beer and placed in steaming vats, to destroy germs in the beer, and preserve it.    Beer thus treated is called export beer.    In this test of bottles fourteen per cent either broke or showed leakage, so that the actual number of bottles that defendant in error really paid for was fourteen per cent off 43,235, or 37,182.    In this test of bottles defendant in error also lost about 6,000 pints of beer, valued at four cents a pint.    In direct examination about the bottles, Mr. Bender says:

"We supposed they were good, but afterwards found out they were not good.    They would hold beer until the beer was put into vats, where it was steamed at pressure, and then the neck of the bottle would come out and we would lose the beer of course, and have to throw them out.    They would pop in the steaming.    The same thing happens with other bottles, but we try to keep the per cent down as much as possible.    This happens with new bottles too."

As to the 17,000 rejected bottles Mr. Bender says:

"We unloaded the car, and started to stand the bottles to one side, but they got to be so many that we just threw them away where we have our cult pile.    Cult is a lot of broken glass."

At all events the defective bottles as well as the broken ones were placed where plaintiff in error was unable to get them; and the Brewing Company so informed Horwich in last letter above quoted.

On the 13th of September, 1898, Horwich drew on the Brewing Company for $800, asking for that sum as payment on account; the draft was not honored and was returned to the drawer.

On the 24th of September, 1898, as suggested in the Brewing Company's letter of September 21st, Horwich drew on the Brewing Company for $623.70, and the draft was paid on the 27th of the same month.

The declaration contains four counts.    The first is for

goods sold and delivered, alleging defendant in error's promise to pay $455.40; the second, that the goods were reasonably worth $455.50; the third and fourth are not applicable to the state of the proof and may be disregarded. Defendant in error pleaded: First, the general issue; second, payment; third, accord and satisfaction; fourth, set-off (more properly recoupment) for $240, based on the loss of 6,000 pints of beer. Proper replications were filed to these pleas, and issues were joined thereon. The plea of recoupment was filed on the day of the trial, and at the same time defendant in error withdrew the general issue. The jury returned a verdict of $1 against the plaintiff, on which, after overruling plaintiff's motion for a new trial, the court rendered judgment.

ELIJAH N. ZOLINE, attorney for plaintiff in error.

TURNER & HOLDER, attorneys for defendant in error.

MR. JUSTICE BIGELOW delivered the opinion of the court.

The theory of plaintiff in error seems to be, that there was a sale of the bottles *in presenti* at Chicago; that the risk of breakage while the goods were in transit from Chicago was with defendant in error, and that the failure of the buyer to return, or offer to return the goods is a sufficient acceptance of them, amounting to an absolute sale; and accordingly the action is brought for the balance of the purchase price of the bottles. The theory of defendant in error's defense does not specifically deny this position, and so far as mere pleading is concerned, the amount claimed by plaintiff in error is conclusively admitted by the Brewing Company's withdrawal of the general issue. As a question of mere pleading, defendant in error's defense is payment, accord and satisfaction, and recoupment, based on an implied promise that the bottles shipped should be fit for bottling export beer. Plaintiff in error did not choose to rely on the admissions as made by the pleadings, but introduced nearly all of the correspondence in evidence, thereby showing what the actual contract was, thus widening the issue,

and enabling the defendant in error to litigate what other-
wise it could not have litigated except by having the
general issue in the record. This explains the supposed
anomaly of the verdict, when it is seen that plaintiff's claim,
of $445.50 was admitted, and that defendant's claim, at most
amounted to $240, so that there should have been a verdict
for the plaintiff for the difference. So long as the jury
found a verdict at all, they must have regarded the plea of
accord and satisfaction as not proven; but under all of the
evidence they must also have found that the 17,000 bottles
defendant did not return, were not worth the purchase
price per gross, agreed upon. The reasonable value of the
17,000 bottles was not made an issue by either the plead-
ings or the instructions, yet the evidence showed that these
bottles could not be used by the defendant, and that they
were rejected when taken from the car; and the result was
that the jury must simply have refused to find that the
rejected bottles were of the value that the contract provided
for. In this the jury acted unadvisedly, but the real fault
was in a misconception of the remedy applied by both par-
ties to the facts proven. Plaintiff in error was wrong in
assuming a sale *in presenti;* and the defendant in error was
wrong in presenting the matters of recoupment for the con-
sideration of the jury at all; and this leads us to examine
the contract of sale, evidenced by correspondence.

The essential elements of the contract are found in the
first six letters and telegrams of the parties and in the act
of shipping the bottles to Belleville on July 6th. The entire
correspondence considered, the contract was not for a car-
load of bottles, but for so many bottles out of a car-load,
" as can be used." The seller brought the goods to the
purchaser, who was authorized out of the bulk to appro-
priate some of the goods to the contract and to reject
others; this authority contemplated both separation and
selection by the buyer, so that in transit from Chicago the
bottles were the property of the plaintiff in error, and the
risk of breakage was his. 2 Schouler's Personal Property,
Secs. 256–259. Under the contract, 43,235 bottles became

an executed sale by the act of the buyer; up to that time the contract was executory.

What defendant should have done, in respect to giving notice to plaintiff that it had rejected 17,000 bottles, is not in this record, because plaintiff himself, by his letter of July 10th (before the car had been unloaded), directed the setting aside of some bottles, and those set aside are not shown by the evidence to be other than the letter authorized. It is for this reason that the case of Barton v. Kane, 17 Wis. 38, has no application here.

In order to further dispose of the matters at issue in this case, it is to be noted that defendant contends that the expression, " for such as can be used," is to be construed to mean such bottles as can be used by applying the steam test to them, because in the correspondence plaintiff mentions that the subject of the sale is export beer bottles, and therefore plaintiff is bound by an implied warranty that the bottles were fit for that purpose. Plaintiff replies that the goods were second hand, and, as a matter of law, there can be no implied warranty in the sale of such goods. On the latter contention we express no opinion, the question being not necessarily involved in this record.

The expression, " such bottles as can be used," means such bottles as defendant deemed good for use at the time its manager made the inspection and selection from the car. The excerpts from the manager's testimony make it plain that he himself so understood the terms of the contract before there was any dispute between the parties. Defendant knew as much about bottles as the plaintiff; and if not, it undertook to select and inspect for itself, thereby relying on its own judgment, without requiring the stipulation now contended for as to pressure tests. It has always been held that on sales of personal property, where the purchaser inspects the goods for himself, even though the seller may know the purpose the buyer intends them for, the rule of *caveat emptor* applies, in the absence of fraud or an express warranty. Hight v. Bacon, 126 Mass. 10; Kohl v. Lindley, 39 Ill. 195; Cogel v. Kniseley, 89 Ill. 598. The distinctions

Horwich v. Western Brewery Co.

are uniquely illustrated in Anson on Contracts, 2d Ed., *132, in a supposed sale of Dresden china. In the American note of Benjamin on Sales, Ed. 1888, pp. 626–8, appears this statement:

"It must be distinctly borne in mind, however, that this implied warranty of fitness does not arise (in the absence of fraud) when the buyer selects his own article on his own judgment, although the vendor (not a manufacturer) knows that it is intended for a particular use. If the purchaser gets the exact article he buys and buys the very thing he gets, he takes the risk of its fitness for the intended use."

There is no pretense of fraud by either concealment or misrepresentation in this case, nor does the evidence show that plaintiff even knew the bottles were to be used for export beer. A sale of export beer bottles is a very different thing from a sale of bottles to be used for bottling export beer, particularly when the judgment of the buyer is the equal of the seller's. It is not pretended that plaintiff did not send export beer bottles; the expression was a mere description of the kind of goods he had for sale; and defendant does not claim that the language created an express warranty. See Vol. 15 Am. & Eng. Ency. of Law, p. 1235; also pp. 1231–1234.

The action was rightfully brought, in so far as there is a declaration for 43,235 bottles sold, and that defendant is liable for that number of bottles, at the contract price, unless its pleas of payment or of accord and satisfaction have been proven in bar of the action. Defendant has not argued that the facts constitute a payment; and *prima facie*, the payment for 37,182 bottles is not a payment for 43,235 bottles, because the claim is liquidated. It may be that the facts warrant a claim of payment, but defendant shows no reason for taking the case out of the ordinary rule, that the payment of a less amount is no consideration for foregoing the balance. The case of Jenks v. Burr, 56 Ill. 450, whether regarded as an authority on the plea of payment or on the plea of accord and satisfaction, was a matter of a claim disputed on the facts; here defendant

admits all the facts that go to make its liability, and appeals to a certain construction of the admitted facts, to shield it from liability. This rule of law plaintiff may or may not have admitted in taking the money which was paid.

As to the plea of accord and satisfaction it was interposed not only to the 6,000 bottles that defendant did not pay for according to the contract price, but also to the 17,000 bottles which it rejected. That the evidence did not even prove an accord and satisfaction for the 17,000 bottles, is too plain for discussion. Did it tend to prove the issue as to the 6,000? There had been between the parties no dispute as to the number of bottles that defendant actually bought; there had been no dispute as to the sum actually due; defendant wrote a letter giving its version of the manner in which the bottles had been selected and afterward tested, and then directed that plaintiff draw a draft for that amount, which was done.

Defendant does not state in its letter that when it pays such a draft it shall extinguish all cause of action between the parties if plaintiff retains the money, and so it was not necessary for the plaintiff to have said at the time he took the money, that he would not accept it in full of all his demands. The money he got he was entitled to. In taking it, plaintiff in error got nothing but that to which he had a prior title and a prior right, and receiving that, he could not be receiving a satisfaction for something else. See Martin v. White, 40 Ill. App. 281. Except for defendant's construction put on the contract, a cause of action existed in favor of plaintiff for the 6,000 bottles not paid for, and under the above quoted decisions his acquiescence in that construction of the law would not extinguish his cause of action under a plea of accord and satisfaction. For further decisions on the matters of this plea, see Van Dyke v. Wilder, 66 Vt. 579, Pottlitzer v. Wesson, 8 Ind. App. 472, and Fuller v. Kemp, 138 N. Y. 231, where the substance of the decision is that the proof must be clear and satisfactory that the condition of the payment of the money be insisted on, and it must not admit of the inference that the debtor

might keep the money tendered in case he did not assent to the condition on which it was tendered.    The letter written by defendant to plaintiff, in view of the fact that the claim was liquidated, was not of that explicit character as to extinguish plaintiff's claim for the 6,000 bottles which were not paid for; it was defendant that needed this unquestioned evidence, and so it was not for the plaintiff to say that he would not accept the amount in full.    As to the 17,000 bottles, they became a bailment in defendant's hands, and so imposed on defendant the obligation of ordinary care. Colton v. Wise, 7 Ill. App. 395.    And defendant itself recognized that fact when it first started to set the bottles aside, instead of throwing them into the cult pile.

Whether defendant is liable in negligence or in trover for the actual value of these bottles is not properly in this case; or whether plaintiff shall elect to sue for money had and received in the sale of the bottles is not now before this court.    It is sufficient to say that the latter view is not declared on by the declaration, and that the former views can in no event be considered in this action of assumpsit.

In view of what has been said, defendant's recoupment for the loss of the beer can neither be pleaded nor proven. It is not a legitimate cause of action against the plaintiff. The pleadings and the instructions in this case being at variance with the views herein expressed, the judgment is reversed and the cause remanded for a new trial.